UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TESAE HARRINGTON**, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 18-cv-1056 (TSC) |
| **SECRETARY OF STATE**, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Tesae Harrington, proceeding *pro se*, sued the Secretary of State[1] for workplace discrimination. Plaintiff's remaining claims[2] are disparate treatment based on her sex, race, and disability, retaliation based on her disability and sex, and hostile work environment based on her disability. Both parties have moved for summary judgment. *See* Pl.'s Mot. for Summ. J., ECF No. 49; Defs.' Cross-Mot., ECF No. 51. For reasons set forth below, the court will DENY Plaintiff's motion and GRANT Defendants' Cross-Motion.

### I.  BACKGROUND[3]

Plaintiff is a Black woman and former State Department contractor in the Division of Defense Trade Controls (DDTC). *See* Defs.' Statement of Undisputed Material Facts

---

[1] Plaintiff sued the Secretary of State and Michael Pompeo as two separate defendants, even though Pompeo was then Secretary of the United States Department of State. For purposes of this motion, the court treats Michael Pompeo and the Secretary of State as Defendants in this action.

[2] On September 30, 2020, the court dismissed Plaintiff's failure to promote disparate treatment claim, her race-based retaliation claim, and her sex and race-based hostile work environment claims. *See* Order, ECF No. 42 at 1.

[3] Because Plaintiff has not complied with Federal Rule of Civil Procedure 56(c) and (e), the court accepts Defendants' undisputed facts as true. *See Infra* Section II.

("SUMF"), ECF No. 51-2 ¶¶ 1, 6; Pl. Aff., ECF No. 51-3 at 3–4. She was employed by Kelly Government Solutions, a subcontractor of Global Solutions Network ("GSN"). See SUMF ¶ 7; Pl. Aff. at 4. From 2007 until June 27, 2014, Plaintiff worked in the Registration Division, and from 2007 through September 2013, she was employed in a scanner position. See SUMF ¶¶ 13–14; Pl. Aff. at 3; Aguirre Aff., ECF No. 51-4 at 3. At all relevant times, Plaintiff's contracting firm supervisor was Tiffany Henderson, and Daniel Cook—a White man—supervised some of Plaintiff's assignments, including registration imaging and storing of registration records, in his role as Supervisory Compliance Specialist in DDTC. See Pl. Aff. at 3; SUMF ¶¶ 24–25; Cook Aff., ECF No. 51-9 at 2–3.

In July 2013, Stacey Gladney—one of Plaintiff's co-workers—reported to Lisa Aguirre that Plaintiff threatened her. See SUMF ¶ 34; Aguirre Aff. at 6. At the time, Aguirre—a White woman—was Chief of Staff of the Office of Defense Trade Controls Management, and it appears that as the contracting officer representative she exercised supervisory authority over Plaintiff. See SUMF ¶¶ 18–19, 21; Aguirre Aff. at 2–4. Aguirre reported the incident to Kelly Government Solutions which, in turn, addressed the matter with Plaintiff and Gladney. See SUMF ¶¶ 35–36; Aguirre Aff. at 5, 8–9.

In September 2013, Plaintiff was moved from a scanner position to a Registration Analyst I position, a move her supervisors considered a promotion. See SUMF ¶¶ 15–16; Aguirre Aff. at 4; Henderson email, ECF No. 51-7 ("The customer has extended a 2% retroactive pay increase to you with an effective date of 10/1/12 through 9/23/13 when you received your promotion."). Around the same time, Plaintiff told Aguirre that she and Rob White—a male employee of a different contract company—had gotten into a "heated argument." Aguirre Aff. at 6; see SUMF ¶ 37; Pl. Aff. at 14, 17. Aguirre reported the incident to Plaintiff and White's

respective companies. As a result, Plaintiff and White met separately with Aguirre, Cook, and representatives from their employers. *See* SUMF ¶¶ 39–40; Aguirre Aff. at 6–7; Pl. Aff. at 15–17.

In Spring 2014, during an office reorganization, Aguirre told Plaintiff that she would be receiving guidance from Cook on duties for the Registration Division and guidance from Aguirre on scanning duties, and therefore Plaintiff would "need to serve two masters for a while." Aguirre Aff. at 8; SUMF ¶¶ 22–23. Around the same time, Plaintiff told Aguirre that she was continuing to have issues with White because, in her estimation, he was not doing enough work. *See* SUMF ¶ 41; Aguirre Aff. at 6; Cook Aff. at 7. Aguirre instructed Plaintiff to discontinue working with and training White. *See* SUMF ¶¶ 42–43; Aguirre Aff. at 6.

In June 2014, Plaintiff told Aguirre that she suffered from dyslexia. *See* SUMF ¶ 2; Pl.'s Aff. at 8; Aguirre Aff. at 4–5. Plaintiff did not provide any supporting documentation of her medical condition or request any accommodation, and she continued to execute her assigned duties. *See* SUMF ¶¶ 3–5; Pl.'s Aff. at 8–9; Aguirre Aff. at 5–6. Cook maintains that he was not made aware of Plaintiff's dyslexia. *See* SUMF ¶ 26; Cook Aff. at 4.

Sometime after Aguirre told Plaintiff not to work with or train White, Plaintiff told White that he was mentally challenged and suffered from a disability, which is why he could not perform his work. SUMF ¶¶ 44; Aguirre Aff. at 6; *see also* Pl.'s Aff., at 25 ("I told Rob I know you have a disability. Rob responded I don't have a disability . . . Rob and I shared an even exchange of words."). White then reported these comments to Aguirre, and on or about June 26, 2014, Aguirre contacted Plaintiff's company and requested that Plaintiff not be permitted to return to the work site. *See* SUMF ¶¶ 44; Aguirre Aff. at 7. Aguirre based her request on Plaintiff's insubordination and disorderly conduct as evidenced by (1) the 2013 incident with

Gladney, (2) the 2013 incident with White, and (3) the 2014 incident with White. *See* SUMF ¶ 48. The same day, Henderson told Plaintiff she was terminated, and several days later Henderson gave Plaintiff written notice confirming that she was let go due to workplace "incidents" which she had "instigate[d]." Pl.'s Aff., at 10–11 (providing that Plaintiff's termination email said the State Department "indicated they have had some history of incidents with you, some of which were addressed by us previously . . . you continued to some extent to instigate issues with co-workers . . . For the reasons listed above, your assignment was ended.").

Under the contract between GSN and the State Department, the State Department could "direct the Contractor to remove any employee immediately from the worksite(s) should it be determined that the person is unfit for the job." GSN Contract ¶ H.8; SUMF ¶ 11. Among other reasons, an employee could be deemed "unfit" due to "[d]isorderly conduct, use of abusive or offensive language, quarreling, intimidation by words or actions, or fighting. Also, participation in disruptive activities which interfere with the normal and efficient operations of the Government." GSN Contract ¶ H.8; SUMF ¶ 12.

Following her termination, Plaintiff timely filed an Equal Employment Opportunity complaint and brought this suit, asserting race, sex, and disability-based disparate treatment and retaliation claims, hostile work environment claims, and failure to promote claims. The court granted Defendants' motion to dismiss several of these claims. *See* Order, 09/30/2020, ECF No. 42.

On June 7, 2021, Plaintiff moved for summary judgment, Pl.'s Mot. for Summ. J., and on July 7, 2021, Defendants cross-moved for summary judgment, *see* Defs.' Cross-Mot. After Defendants filed their motion, the court issued a *Fox-Neal* order advising Plaintiff of her obligations under the Federal Rules of Civil Procedure and the Local Rules. *See* Order,

09/14/2021, ECF No. 57 at 2–4. The Order provided detailed instructions for how Plaintiff should comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(b), (h). *Id.* Plaintiff was specifically cautioned that "the court may accept as true any factual assertions contained in affidavits or attachments submitted by the Defendant, unless the Plaintiff submits her own affidavits or documentary evidence showing that the Defendant's assertions are untrue." *Id.* at 4 (citing *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992)).

In opposing Defendants' cross-motion, Plaintiff did not file a separate statement disputing Defendants' statement of undisputed facts, as required by Local Rule 7(h)(1). In her opposition, in a section titled "Defendant Aguirre statement of Fact Document 51-2," Plaintiff appears to respond to several of Defendants' asserted facts, but in refuting Defendants' facts she either makes allegations without supporting evidence or cites to evidence which is not actually contradictory. *See* Pl.'s Combined Reply and Opp'n at 3–6.

## II.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, (internal quotations marks omitted). The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). Rule 56(c)(1) requires:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Furthermore, the court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). If a party fails to comply with Rule 56(c), then the court may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

And "[w]hile we liberally construe *pro se* pleadings, *pro se* litigants do not have a 'license' to 'ignore the Federal Rules of Civil Procedure.'" *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 397 (D.C. Cir. 2020) (quoting *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993)).

### III.    ANALYSIS

**A. Plaintiff's Sex, Race, and Disability-based Disparate Treatment Claims**

In a Title VII disparate treatment suit the court's focus is on whether the plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Similarly, a disability disparate treatment claim under the Rehabilitation Act requires that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citation omitted). The court must consider these questions "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (cleaned up and citation omitted).

In her Complaint, Plaintiff alleges that Defendants subjected her to disparate treatment by:

> (1) Not recommending White for termination after an incident in which he yelled at her, and later hugged her without consent, even though she was terminated after White reported an argument with her;
> (2) Grouping all Black employees into one department, resulting in lower pay for Black employees;
> (3) Telling her that she has to serve "two masters;"
> (4) Recommending her for termination because of her disability.

Compl., ECF No. 1-1 at 30, 35–37, 39; *see also* Mem. Opinion, 09/30/2020, ECF No. 41 at 7–8 (identifying Plaintiff's allegations that support her sex and race-based disparate treatment claims). Now at the summary judgment stage, Plaintiff's allegation that she was subjected to a

non-consensual hug from White is only supported by her own affidavit, *see* Pl.'s Aff. at 14, 17, and there is no support in the record for her allegation that all Black employees were grouped together and paid less than White employees.

Because Defendants "assum[e] for purposes of this motion . . . that Plaintiff can prove a prima facie case of discrimination," Defs.' Mem., ECF No. 51-1 at 14, the court proceeds directly to determining whether Defendants' proffered reasons for terminating Plaintiff are pretextual. Defendants claim that Plaintiff was terminated because she "refused direction from Ms. Aguirre" and was disruptive to the work environment. *Id*. (citations omitted). As evidence of Plaintiff's disruptive behavior, Defendants rely on three incidents: (1) Gladney's complaint to Aguirre in July 2013 that Plaintiff threatened her; (2) Plaintiff and White's "heated argument," later in 2013; and (3) Plaintiff telling White that "he was mentally challenged and suffered from a disability" in June 2014, after Aguirre instructed her not to interact with White. *Id*. (citing SUMF ¶¶ 34–46); *see also* Aguirre's Aff. at 6 (answering that "Gladney[] reported that [Plaintiff] was threatening her"); Pl.'s Aff. at 17 (describing an incident between Plaintiff and White during which Plaintiff asserts that White was "yelling to the top of his lungs" after she told him "not to touch anything on [her] desk again"); Aguirre's Aff. at 6 (explaining that she was concerned about Plaintiff's conduct when, in Spring 2014, White told her that Plaintiff said he "has a mental challenge"); Cook Aff. at 7 (explaining that Plaintiff was terminated because she "continued to train Rob White after [Aguirre] specifically directed [her] to cease working with Rob or trying to train him").

Importantly, Plaintiff does not dispute Defendants' proffered reasons for her firing, *see* SUMF ¶ 48, instead she merely asserts—without supporting evidence—that "Aguirre[']s claim that I threatened Stacy Gladney is a unfathomable lie," and Aguirre's recollection of the incident

with White demonstrates "a clear view of her Bias attitude against African American women." Pl.'s Combined Reply and Opp'n at 3–4. These unsupported assertions are not sufficient for a factfinder to find discrimination. Under the GSN contract, Defendants can "direct the Contractor to remove any employee" due to "[d]isorderly conduct, use of abusive or offensive language, quarreling . . . [or] participation in disruptive activities which interfere with the normal and efficient operations of the Government." GSN Contract ¶ H.8. Given the reports Defendants received from Gladney and White, it was not unreasonable for Defendants to believe that Plaintiff's workplace conduct was disorderly and thus seek her termination. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (holding that "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" (internal punctuation omitted)).

### i. Race-based Disparate Treatment Claim

In ruling on Defendants' motion to dismiss, the court concluded that Plaintiff could proceed on her race-based termination claim because she had sufficiently alleged that (1) her White supervisors had grouped all Black employees into one department, resulting in lower pay, and (2) Aguirre told her she worked for "two masters." Mem. Opinion at 8. In her opposition to Defendants' cross-motion for summary judgment, Plaintiff attached an affidavit which appears to show the names of employees, their departments, and an associated identification number. *See* Pl.'s Combined Reply and Opp'n at 18–19. But this document sheds no light on the employees' races, and there is no evidence in the record to establish whether employees are grouped by race and how their salaries compare to colleagues of other races.

Further, although Defendants admit that during an office reorganization Aguirre commented that she and Cook would provide Plaintiff guidance on her duties and Plaintiff would therefore "need to serve two masters for a while," SUMF ¶ 23, this single comment cannot form the basis of a race-based disparate treatment claim. *See Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 323 (D.D.C. 2018) (quoting *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016) ("It is well established that 'an isolated race-based remark unrelated to the relevant employment decision does not, without more, permit a jury to infer discrimination.'" (internal brackets omitted)). Moreover, Plaintiff asserts that she was "harassed and demoted" after she asked "to be treated equally to [her] white coworkers," that her white coworkers were "given Compliance Job titles because of their White Race," and that she "could not even sit in the ENFORCEMENT DIVISION because of the color of [her] skin." Pl.'s Combined Reply and Opp'n at 11–12. But she has not provided any evidentiary support for her allegations. Accordingly, Plaintiff's race-based disparate treatment claim cannot proceed.

## ii. Sex-based Disparate Treatment Claim

Plaintiff's sex-based disparate treatment claim is based on her assertions that (1) White was not recommended for termination following their June 2014 argument, (2) Aguirre terminated two other Black women by "questionable means," and (3) Cook and White were permitted to harass her and "[n]othing happened to them." Pl.'s Mot. for Summ. J. at 4. First, to rely on comparator evidence, Plaintiff must demonstrate "that all of the relevant aspects of her employment situation were nearly identical to those" of White. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (internal punctuation and citation omitted). Although Plaintiff was recommended for termination after the June 2014 incident with White and he was not, they are not similarly situated because Plaintiff has not pointed to evidence

showing he had a similar disciplinary record to hers, which contained at least three incidents of workplace misconduct. Therefore, White is an inapt comparator. *See e.g.*, *Gulley v. District of Columbia*, 474 F. Supp. 3d 154, 167 (D.D.C. 2020) ("None of his comparators has a disciplinary record as extensive as his."). Second, whether Aguirre terminated two other Black women for unlawful reasons does not allow a factfinder to infer that Plaintiff's termination was racially discriminatory, nor does Plaintiff provide evidentiary support for the claim. Third, Plaintiff has provided no support for her claim that Cook and White harassed her.

### iii. Disability-based Disparate Treatment Claim

The only fact in the record that sustains a possible inference of disability-based termination is that Plaintiff was fired within one month after she told Aguirre that she has dyslexia; but a totality of the circumstances analysis requires that this fact be considered alongside all the others. *See Hamilton*, 666 F.3d at 1351. Because Plaintiff has not proffered any evidence of pretext, shown that it was unreasonable for Defendants to believe the workplace misconduct reports about Plaintiff from Gladney and White, or disputed certain material facts such as her disregard of Aguirre's instructions not to train or work with White, no reasonable factfinder could find that Defendants' reasons for recommending Plaintiff's termination were pretextual. *See Doak v. Johnson*, 19 F. Supp. 3d 259, 273 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015) (dismissing a disability based disparate treatment claim where Plaintiff "provided no evidence" that she was discriminated against because of her disability); *Fischbach*, 86 F.3d at 1183.

## B. Sex and Disability-based Retaliation Claims

Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against [an] employee[] . . . because he has opposed any practice" prohibited by Title VII. 42 U.S.C. § 2000e-3(a). Statutorily protected activities include "opposing alleged discriminatory

treatment by the employer or participating in legal efforts against the alleged treatment," *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212 (D.D.C. 2006) (citation omitted), and a plaintiff "must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation," *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91–92 (D.D.C. 2006).  Retaliation is similarly banned under the Rehabilitation Act.  *See Walker v. District of Columbia*, 279 F. Supp. 3d 246, 271 (D.D.C. 2017) (explaining that the standards articulated in the Title VII employment context apply to Rehabilitation Act claims).

Retaliation claims with no direct evidence of reprisal are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). However, once a defendant proffers a legitimate, nondiscriminatory reason for the materially adverse employment action, a court must "proceed[] to the ultimate issue of retaliation *vel non*." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *see also Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007) (once a defendant proffers a non-discriminatory reason, whether a plaintiff established a prima facie case is generally "no longer relevant.").  "At that stage, the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Jones*, 557 F.3d at 678 (internal quotation marks and citation omitted).  Once an employer provides "a legitimate, nonretaliatory reason for its employment action, 'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation is genuine.'"  *Durant v. District of Columbia Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011)) (internal brackets omitted).

For purposes of this motion, Defendants assume that Plaintiff has met her prima facie burden to show retaliation, *see* Defs.' Mem. at 14, but on the ultimate retaliation issue Plaintiff has not directly or indirectly shown a material dispute. In deciding the motion to dismiss, the court concluded that Plaintiff made out sex and disability-based retaliation claims because she pleaded that she reported to Cook in March 2014 that a co-worker made fun of her disability, reported to Aguirre in May 2014 that Cook laughed at her disability, reported to Aguirre and Cook a non-consensual hug from White, and was terminated within a few months of reporting the inappropriate conduct. *See* Mem. Opinion at 13. On the record now before the court, Plaintiff has not shown "that a discriminatory reason more likely motivated the employer" or that "the employer's proffered explanation is unworthy of credence," *Jones*, 557 F.3d at 678, because she has not proffered evidence that her termination was pretextual, *see Supra* Section III. A.

The only evidence potentially supporting an inference of disability-based retaliation is the temporal proximity between Plaintiff telling Aguirre that she has dyslexia in early June and her subsequent termination at the end of the month. While temporal proximity can sometimes suffice, Plaintiff has not gone further and offered any "positive evidence" of retaliation, for instance that Aguirre revealed her disability to Cook or to Plaintiff's company, or that her disability was a factor in recommending her for termination. *See Talavera*, 638 F.3d at 313. Consequently, no reasonable factfinder would find, without more, that she was terminated for reporting her dyslexia.

Moreover, Plaintiff's allegations that she reported a non-consensual hug from White in either 2013 or July 2014 and that she threatened to call the police, are supported only by her own affidavit, *see* Pl.'s Aff. at 14, 17, and Plaintiff has not pointed to her affidavit as supporting evidence in her motion or opposition. *See* Fed. R. Civ. Pro. 56 (c)(1) (requiring that a party

seeking to demonstrate that a fact is "genuinely disputed . . . support the assertion by: citing to particular parts of materials in the record"). This is the only incident she alleged which would establish that she engaged in protected activity and would potentially permit an inference of sex-based retaliation. *See* Mem. Opinion at 13. Even assuming this incident took place—and its timing is entirely unclear, especially since Plaintiff was terminated on June 26, 2014—Plaintiff has not provided evidence of pretext, and consequently no reasonable factfinder could conclude that Defendants retaliated against Plaintiff for reporting this issue.

### C. Disability-based Hostile Work Environment Claim

"Not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999). To prevail on a hostile work environment claim, a plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). A court considers "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

In ruling on Defendants' motion to dismiss, the court concluded that "[a]lthough it is a close case," Plaintiff could proceed on her disability-based hostile work environment claim. Mem. Opinion at 14. Plaintiff pled that Cook was aware of her disability and assigned her tasks outside the scope of her duties, and on two separate occasions Cook laughed when co-workers made derogatory comments about her disabilities. *Id*. at 14–15. But at the summary judgment stage, there is no evidence in the record showing that Cook knew that Plaintiff has dyslexia, and

he maintains that he did not know. *See* SUMF ¶¶ 26–27. Nor are there facts in the record from which to infer that Cook assigned Plaintiff tasks that were too difficult for her to accomplish because of her disability. A reasonable factfinder might infer the opposite, given that Plaintiff's own exhibit shows that at least one colleague was grateful for her work product on the last day of her employment. *See* Pl.'s Combined Reply and Opp'n at 17 ("Many thanks for all the work populating the system so far!"). The only fact still in dispute is whether two co-workers made derogatory comments about Plaintiff's disability, drawing laughs from others including Cook. *See* Pl.'s Aff. at 17 (recalling that a co-worker made a comment at a meeting that she was tired of working with her "weird friends upstairs" and everyone, including Cook, laughed while looking at Plaintiff); SUMF ¶ 29 (Cook "does not recall any employees making a comment when he made the announcement."). But even if the incident did occur, it is not so "extreme to amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788, and therefore Defendants' cross-motion for summary judgment on Plaintiff's hostile work environment claim will be granted as well. *See e.g.*, *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78–81 (D.D.C. 2007) (denying a plaintiff's hostile work environment claim because a few isolated incidents and disparate acts do not make a work environment hostile).

## IV.   CONCLUSION

For the reasons set forth above, the court will GRANT Defendants' Cross-Motion for Summary Judgment: ECF No. 50. Plaintiff has not shown that she is entitled to summary judgment, and the court will therefore DENY her Motion for Summary Judgment: ECF No. 49.

Date: March 1, 2023

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge