UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| **TESAE HARRINGTON**, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 18-cv-1056 (TSC) |
| **SECRETARY OF STATE/MICHAEL R. POMPEO**, | ) |
| Defendant. | ) |

## AMENDED MEMORANDUM OPINION[1]

Plaintiff Tesae Harrington, proceeding *pro se*, sued Secretary of State Michael Pompeo[2] for workplace discrimination. Plaintiff's remaining claims[3] are for disparate treatment based on her sex, race, and disability, retaliation based on her disability and sex, and hostile work environment based on her disability. Both parties have moved for summary judgment. *See* Pl. Mot. for Summ. J., ECF No. 49; Def. Cross-Mot., ECF No. 51. For reasons set forth below, the court will DENY Plaintiff's motion and GRANT Defendant's Cross-Motion.

---

[1] The court hereby amends its March 1, 2023 Memorandum Opinion to reflect changes in its legal analysis of the issues presented. The corresponding order is unchanged, and this action remains dismissed pursuant to Federal Rule of Civil Procedure 56. *See* ECF No. 65.

[2] Plaintiff does not appear to bring her claims against Pompeo in his individual capacity.

[3] On September 30, 2020, the court dismissed Plaintiff's failure to promote disparate treatment claim, her race-based retaliation claim, and her sex and race-based hostile work environment claims. *See* Order, ECF No. 42 at 1.

Page **1** of **17**

I. **BACKGROUND**[4]

Plaintiff is a Black woman and former State Department contractor in the Division of Defense Trade Controls (DDTC). *See* Def. Statement of Undisputed Material Facts ("SUMF"), ECF No. 51-2 ¶¶ 1, 6; Pl. Aff., ECF No. 51-3 at 3–4. She was employed by Kelly Government Solutions, a subcontractor of Global Solutions Network ("GSN"). *See* SUMF ¶ 7; Pl. Aff. at 4. From 2007 until June 27, 2014, Plaintiff worked in the Registration Division, and from 2007 through September 2013, she was employed in a scanner position. *See* SUMF ¶¶ 13–14; Pl. Aff. at 3; Aguirre Aff., ECF No. 51-4 at 3. At all relevant times, Plaintiff's contracting firm supervisor was Tiffany Henderson, and Daniel Cook—a White man—supervised some of Plaintiff's assignments, including registration imaging and storing of registration records, in his role as Supervisory Compliance Specialist in DDTC. *See* Pl. Aff. at 3; SUMF ¶¶ 24–25; Cook Aff., ECF No. 51-9 at 2–3.

In July 2013, Stacey Gladney—one of Plaintiff's co-workers—reported to Lisa Aguirre that Plaintiff threatened her. *See* SUMF ¶ 34; Aguirre Aff. at 6. At the time, Aguirre—a White woman—was Chief of Staff of the Office of Defense Trade Controls Management, and it appears that as the contracting officer representative she exercised supervisory authority over Plaintiff. *See* SUMF ¶¶ 18–19, 21; Aguirre Aff. at 2–4. Aguirre reported the incident to Kelly Government Solutions which, in turn, addressed the matter with Plaintiff and Gladney. *See* SUMF ¶¶ 35–36; Aguirre Aff. at 5, 8–9.

Plaintiff alleges that between July and September 2013, she asked Rob White—who is White and employed through a different contractor—if he had repeatedly turned off her desk

---

[4] Because Plaintiff has not complied with Federal Rule of Civil Procedure 56(c) and (e), the court accepts Defendants' undisputed facts as true. *See Infra* Section II.

fan/heater and he admitted to doing so. Pl. Aff. at 10, 13, 16. Plaintiff told him not touch anything on her desk and claims he "went off," started pacing back and forth, and began yelling at her, telling her to leave him alone and ultimately left the office for the day. *Id*. Plaintiff claims she feared White would hit her, she was crying hysterically, and she reported the incident to Aguirre. *Id*.

Plaintiff further alleges that the following day, White hugged her "from the back" while she was sitting at her desk and said he was sorry. *Id.* Plaintiff told him not to touch her again, reported the incident to Aguirre, and threatened to call the police. *Id*. Ultimately Aguirre, Cook, Henderson, and the contracting company owner met with Plaintiff and told her if she ever felt threatened by White to go to a place where she felt safe and call the company owner. *Id*. at 13, 16. Aguirre claims she, Cook, and a representative from White's subcontracting company also met with White about the matter. Aguirre Aff. at 6. Plaintiff claims that at some point, Aguirre purportedly explained that she believed White's apology was sincere and did not recommend White for termination. Pl. Aff. at 16, 23; *see* Aguirre Aff. at 6.

Plaintiff states in her affidavit that although she was "[f]orced to work with [White] on a daily basis, Aguirre "never had to address any other issues" between the two and Aguirre testified that White had no further conduct issues after their meeting. Pl. Aff. at 14, 16; Aguirre Aff. at 6. Plaintiff contends, however, that White often made derogatory comments about her to other coworkers and claims he "sucked his teeth" and would "say things under his breath" when he walked past her desk. Pl. Aff. at 14, 19.

In September 2013 Plaintiff was moved from a scanner position to a Registration Analyst I position, a move her supervisors considered a promotion. *See* SUMF ¶¶ 15–16; Aguirre Aff. at

4; Henderson email, ECF No. 51-7 ("The customer has extended a 2% retroactive pay increase to you with an effective date of 10/1/12 through 9/23/13 when you received your promotion.").

In Spring 2014, during an office reorganization, Aguirre told Plaintiff that she would be receiving guidance from Cook on duties for the Registration Division and guidance from Aguirre on scanning duties, and therefore Plaintiff would "need to serve two masters for a while." Aguirre Aff. at 8; SUMF ¶¶ 22–23. Around the same time, Plaintiff told Aguirre that she was continuing to have issues with White because, in her view, he was not doing enough work. *See* SUMF ¶ 41; Aguirre Aff. at 6; Cook Aff. at 7. Aguirre instructed Plaintiff to stop working with and training White. *See* SUMF ¶¶ 42–43; Aguirre Aff. at 6.

In June 2014 Plaintiff told Aguirre that she suffered from dyslexia. *See* SUMF ¶ 2; Pl. Aff. at 8; Aguirre Aff. at 4–5. Plaintiff did not request any accommodation and continued to perform her assigned duties. *See* SUMF ¶¶ 3–5; Pl. Aff. at 8–9; Aguirre Aff. at 5–6. Cook maintains that he was not made aware of Plaintiff's dyslexia. *See* SUMF ¶ 26; Cook Aff. at 4.

Sometime after Aguirre told Plaintiff not to work with or train White, Plaintiff told White that he was mentally challenged and suffered from a disability, which is why he could not perform his work. SUMF ¶¶ 44; Aguirre Aff. at 6; *see also* Pl. Aff., at 25 ("I explained to Rob that I was Dyslexic . . . . I told Rob I know you have a disability. Rob responded I don't have a disability . . . Rob and I shared an even exchange of words."). White then reported these comments to Aguirre, and on or about June 26, 2014, Aguirre contacted Plaintiff's company and requested that Plaintiff not be permitted to return to the work site. *See* SUMF ¶¶ 44; Aguirre Aff. at 7. Aguirre based her request on Plaintiff's insubordination and disorderly conduct as evidenced by (1) the 2013 incident with Gladney, (2) the 2013 incident with White, (3) the 2014 incident with White; and (4) Plaintiff's noncompliance with the directive to stop working with or

training White.  *See* SUMF ¶ 48.  The same day, Henderson told Plaintiff she was terminated, and several days later Henderson gave Plaintiff written notice confirming that she was let go due to workplace "incidents" which she had "instigate[d]."  Pl. Aff., at 10–11 (providing that Plaintiff's termination email said the State Department "indicated they have had some history of incidents with you, some of which were addressed by us previously . . . you continued to some extent to instigate issues with co-workers . . . For the reasons listed above, your assignment was ended.").

Under the contract between GSN and the State Department, the State Department could "direct the Contractor to remove any employee immediately from the worksite(s) should it be determined that the person is unfit for the job."  GSN Contract ¶ H.8; SUMF ¶ 11.  Among other reasons, an employee could be deemed "unfit" due to "[d]isorderly conduct, use of abusive or offensive language, quarreling, intimidation by words or actions, or fighting.  Also, participation in disruptive activities which interfere with the normal and efficient operations of the Government."  GSN Contract ¶ H.8; SUMF ¶ 12.

Following her termination, Plaintiff timely filed an Equal Employment Opportunity complaint and brought this suit, asserting race, sex, and disability-based disparate treatment and retaliation claims, hostile work environment claims, and failure to promote claims.  The court granted Defendant's motion to dismiss several of these claims.  *See* Order, 09/30/2020, ECF No. 42.

On June 7, 2021, Plaintiff moved for summary judgment, but only included a few references to the record and failed to include the required statement of undisputed facts.  On July 7, 2021, Defendant cross-moved for summary judgment and the court subsequently issued a *Fox-Neal* order advising Plaintiff of her obligations under the Federal Rules of Civil Procedure and

the Local Rules. *See* Order, ECF No. 57 at 2–4. The Order provided detailed instructions for how Plaintiff should comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(b), (h). *Id*. Plaintiff was specifically cautioned that "the court may accept as true any factual assertions contained in affidavits or attachments submitted by the Defendant, unless the Plaintiff submits her own affidavits or documentary evidence showing that the Defendant's assertions are untrue." *Id*. at 4 (citing *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992)).

Plaintiff filed an opposition to Defendant's cross-motion but did not file a separate statement disputing Defendant's statement of undisputed facts, as required by Local Rule 7(h)(1). In her opposition, in a section titled "Defendant Aguirre statement of Fact Document 51-2," Plaintiff appears to respond to several of Defendant's asserted facts, but in refuting Defendant's facts she either makes allegations without supporting evidence or cites to evidence which is not actually contradictory. *See* Pl. Combined Reply and Opp'n at 3–6.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, (internal quotations marks omitted).  The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted).  Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Furthermore, the court "need consider only the cited materials."  Fed. R. Civ. P. 56(c)(3).  If a party fails to comply with Rule 56(c), then the court may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

And "[w]hile we liberally construe *pro se* pleadings, *pro se* litigants do not have a 'license' to 'ignore the Federal Rules of Civil Procedure.'" *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 397 (D.C. Cir. 2020) (quoting *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993)).

### III.     ANALYSIS

**A. Plaintiff's Sex, Race, and Disability-based Disparate Treatment Claims**

In a Title VII disparate treatment suit the court's focus is on whether the plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Similarly, a disability disparate treatment claim under the Rehabilitation Act requires that the plaintiff have suffered an adverse employment action because of her disability or perceived disability. *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citation omitted); *Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213, 238—40 (D.D.C. 2005) (citing 42 U.S.C. §§ 12102(2)(A); 12102(2)(C)).  The court must consider these questions "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (cleaned up and citation omitted).

Because Defendant "assum[es] for purposes of this motion . . . that Plaintiff can prove a prima facie case of discrimination," Def. Mem., ECF No. 51-1 at 14, the court proceeds directly to determining whether Defendant's proffered reasons for terminating Plaintiff are pretextual. Defendant claims that Plaintiff was terminated because she "refused direction from Ms. Aguirre" and was disruptive to the work environment. *Id*. (citations omitted); *see* Aguirre at 5 (explaining that in Spring 2014 Aguirre instructed Plaintiff to not work with or train White, but she

continued to do so anyway). As evidence of Plaintiff's disruptive behavior, Defendant relies on three incidents: (1) Gladney's complaint to Aguirre in July 2013 that Plaintiff threatened her; (2) Plaintiff and White's "heated argument," later in 2013; and (3) Plaintiff telling White that "he was mentally challenged and suffered from a disability" in June 2014, after Aguirre instructed her not to interact with White. *Id*. (citing SUMF ¶¶ 34–48); *see also* Aguirre Aff. at 6 (answering that "Gladney[] reported that [Plaintiff] was threatening her"); Pl. Aff. at 17 (describing an incident between Plaintiff and White during which Plaintiff asserts that White was "yelling to the top of his lungs" after she told him "not to touch anything on [her] desk again"); Aguirre Aff. at 6 (explaining that she was concerned about Plaintiff's conduct when, in Spring 2014, White told her that Plaintiff said he "has a mental challenge.").

      Despite not responding to Defendant's statement of facts, Plaintiff asserts that "Aguirre['s] claim that I threatened Stacy Gladney is a unfathomable lie," and that Aguirre's recollection of the incident with White demonstrates "a clear view of her Bias attitude against African American women." Pl. Combined Reply and Opp'n at 3–4. These unsupported assertions are not enough for a factfinder to find discrimination. Under the GSN contract, Defendant can "direct the Contractor to remove any employee" due to "[d]isorderly conduct, use of abusive or offensive language, quarreling . . . [or] participation in disruptive activities which interfere with the normal and efficient operations of the Government." GSN Contract ¶ H.8. Plaintiff does not dispute that an argument took place between her and White in 2013 or that she called him mentally challenged. Given the reports Defendant received from Gladney and White, it was not unreasonable for Defendant to believe that Plaintiff's workplace conduct was disruptive and thus seek her termination. *See Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (holding that "[o]nce the employer has articulated a non-

discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'") (internal punctuation omitted).

### i. *Race-based Disparate Treatment Claim*

In ruling on Defendant's motion to dismiss, the court concluded that Plaintiff could proceed on her race-based termination claim because she had sufficiently alleged that (1) her White supervisors had grouped all Black employees into one department, resulting in lower pay, and (2) Aguirre told her she worked for "two masters."  Mem. Opinion, 09/30/20, ECF No.41 at 8.  In her opposition to Defendant's cross-motion for summary judgment, Plaintiff attached an exhibit which appears to show the names of employees, their departments, and an associated identification number.  *See* Pl. Combined Reply and Opp'n at 11–14, 18–19.  But this document sheds no light on the employees' races, and there is no evidence in the record to establish whether employees are grouped by race and how their salaries compare to colleagues of other races.

Moreover, although Defendant admits that during an office reorganization Aguirre commented that she and Cook would provide Plaintiff guidance on her duties and Plaintiff would therefore "need to serve two masters for a while," SUMF ¶ 23, this single comment cannot form the basis of a race-based disparate treatment claim.  *See Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 323 (D.D.C. 2018) (quoting *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016) ("It is well established that 'an isolated race-based remark unrelated to the relevant employment decision does not, without more, permit a jury to infer discrimination.'" (internal brackets omitted)).  Further, Plaintiff claims she was "harassed and demoted" after she asked "to be treated equally to [her] white coworkers," that her white coworkers were "given Compliance

Job titles because of their White Race," and that she "could not even sit in the ENFORCEMENT DIVISION because of the color of [her] skin." Pl. Combined Reply and Opp'n at 11–12. But she has not provided or pointed to any evidentiary support in the record for these allegations, and therefore her race-based disparate treatment claim cannot proceed.

## ii. *Sex-based Disparate Treatment Claim*

Plaintiff's sex-based disparate treatment claim is based on her allegations that (1) White was not recommended for termination following their June 2014 argument, (2) Aguirre terminated two other Black women by "questionable means," and (3) Cook and White were permitted to harass her and "[n]othing happened to them." Pl. Mot. for Summ. J. at 4.

First, to rely on comparator evidence, Plaintiff must demonstrate "that all of the relevant aspects of her employment situation were nearly identical to those" of the comparator. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (internal punctuation and citation omitted). Although Plaintiff was recommended for termination after the June 2014 incident with White and he was not, they are not similarly situated because Plaintiff has not pointed to evidence showing he had a similar disciplinary record to hers, which contained at least three incidents of workplace disruption. Therefore, White is an inapt comparator. *See e.g.*, *Gulley v. District of Columbia*, 474 F. Supp. 3d 154, 167 (D.D.C. 2020) ("None of his comparators has a disciplinary record as extensive as his.").

Second, whether Aguirre terminated two other Black women for unlawful reasons does not allow a factfinder to infer that Plaintiff's termination was the result of sex-based discrimination, nor does Plaintiff provide evidentiary support for the claim. Third, the evidence set forth by Plaintiff in her affidavit regarding Cook's alleged harassment is insufficient to establish pretext. *See* Pl. Aff. at 11, 15, 16, 19, 21 (describing Cook's harassment of her: he used

"bold," "stern," and "forceful" language when addressing her, he required her to train White and write training manuals, he looked at her while laughing when a female colleague commented that "she was tired of working with her weird friends upstairs," and he told her that she was not allowed "in his circle because [she is] trouble" (internal quotation marks omitted)).

### iii. Disability-based Disparate Treatment Claim

The only fact in the record that could sustain a possible inference of disability-based termination is that Plaintiff was fired within one month after she told Aguirre that she has dyslexia; but a totality of the circumstances analysis requires that this fact be considered alongside all the others. *See Hamilton*, 666 F.3d at 1351. Because Plaintiff has not proffered any evidence of pretext, shown that it was unreasonable for Defendant to believe the workplace misconduct reports about Plaintiff from Gladney and White, or disputed certain material facts such as her disregard of Aguirre's instructions not to train or work with White, there is no evidence from which a reasonable factfinder could find that Defendant's reasons for recommending Plaintiff's termination were pretextual. *See Doak v. Johnson*, 19 F. Supp. 3d 259, 273 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015) (dismissing a disability based disparate treatment claim where Plaintiff "provided no evidence" that she was discriminated against because of her disability); *Fischbach*, 86 F.3d at 1183.

## B. Sex and Disability-based Retaliation Claims

Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against [an] employee[] . . . because he has opposed any practice" prohibited by Title VII. 42 U.S.C. § 2000e-3(a). Statutorily protected activities include "opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment," *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212 (D.D.C. 2006) (citation omitted), and a plaintiff "must be opposing an employment practice made unlawful by the statute

under which she has filed her claim of retaliation," *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91–92 (D.D.C. 2006).  Retaliation is similarly banned under the Rehabilitation Act. *See Walker v. District of Columbia*, 279 F. Supp. 3d 246, 271 (D.D.C. 2017) (explaining that the standards articulated in the Title VII employment context apply to Rehabilitation Act claims).

Retaliation claims with no direct evidence of reprisal are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). However, once a defendant proffers a legitimate, nondiscriminatory reason for the materially adverse employment action, a court must "proceed[] to the ultimate issue of retaliation *vel non*." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *see also Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007) (once a defendant proffers a non-discriminatory reason, whether a plaintiff established a prima facie case is generally "no longer relevant.").  "At that stage, the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (internal quotation marks and citation omitted).  Once an employer provides "a legitimate, nonretaliatory reason for its employment action, 'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation is genuine.'" *Durant v. District of Columbia Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011)) (internal brackets omitted).

For purposes of this motion, Defendant assumes that Plaintiff has met her prima facie burden to show retaliation, *see* Def. Mem. at 14, but argues that she has not established evidence that the reasons for her termination were pretextual.  In deciding the motion to dismiss, the court

concluded that Plaintiff could make out sex and disability-based retaliation claims because she pleaded that she reported to Cook in March 2014 that a co-worker made fun of her disability, reported to Aguirre in May 2014 that Cook laughed at her disability, reported to Aguirre and Cook a non-consensual hug from White, and was terminated within a "few months" of reporting "inappropriate conduct." Mem. Opinion at 13. On the record before the court, Plaintiff has not shown evidence from which a fact finder could determine "that a discriminatory reason more likely motivated the employer" or that "the employer's proffered explanation is unworthy of credence," *Jones*, 557 F.3d at 678, because she has not proffered evidence that her termination was pretextual, *see Supra* Section III.A.

At this juncture, Plaintiff has not pointed to evidence supporting an inference that she was terminated because she reported disability-based discrimination to Cook in March 2014 or to Aguirre in May 2014. While temporal proximity can sometimes suffice, Plaintiff has not gone further and offered any "positive evidence" of retaliation, for instance that her disability was a factor in Aguirre recommending her for termination or that these reports were improperly shared with her co-workers. *See Talavera*, 638 F.3d at 313. Consequently, no reasonable factfinder could find, without more, that she was terminated because she reported that her co-workers laughed at her and made fun of her disability.

Moreover, the only alleged incident establishing that she engaged in protected activity, and potentially permitting an inference of sex-based retaliation, is Plaintiff's reported non-consensual hug from White and her subsequent threat to call the police. *See* Pl. Aff. at 14, 17; Mem. Opinion at 13 (explaining that the court should not dismiss Plaintiff's sex-based retaliation claim because she alleged a nonconsensual hug from White). However, Plaintiff reported the alleged hug between July and September 2013, but the State Department did not terminate

Plaintiff until June 2014.  Thus, Plaintiff cannot rely on temporal proximity to establish evidence of pretext and, as discussed above, she has no other gender-based evidence that the reasons for her termination were pretextual.  *See* Supra Section III.A.  Consequently, no reasonable factfinder could conclude that Defendant retaliated against her for reporting unwanted touching from her male colleague.

### C. Disability-based Hostile Work Environment Claim

"Not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999).  To prevail on a hostile work environment claim, a plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  A court considers "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

In ruling on Defendant's motion to dismiss, the court concluded that "[a]lthough it is a close case," Plaintiff could proceed on her disability-based hostile work environment claim.  Mem. Opinion at 14.  Plaintiff pleaded that Cook was aware of her disability and assigned her tasks outside the scope of her duties, and on two separate occasions Cook laughed when co-workers made derogatory comments about her disabilities.  *Id*. at 14–15.  But at the summary judgment stage, there is no evidence in the record showing that Cook knew that Plaintiff has dyslexia, and he maintains that he did not know.  *See* SUMF ¶¶ 26–27.  Nor are there facts in the record from which to infer that Cook assigned Plaintiff tasks that were too difficult for her to

accomplish because of her disability. A reasonable factfinder might infer the opposite, given that Plaintiff's own exhibit shows that at least one colleague was grateful for her work product on the last day of her employment. *See* Pl. Combined Reply and Opp'n at 17 ("Many thanks for all the work populating the system so far!"); *see also* Pl. Aff. at 7 ("I performed all my previous job duties without accommodations as a perfectionist. I have always adopted my own methods in completing my work.").

The only fact still in dispute is whether two co-workers made derogatory comments about Plaintiff's disability, drawing laughs from others including Cook. *See* Pl. Aff. at 17 (recalling that a co-worker made a comment at a meeting that she was tired of working with her "weird friends upstairs" and everyone, including Cook, laughed while looking at Plaintiff). As a threshold matter, Plaintiff has provided no evidence that her coworker's comments were directed at her. Further, the fact that Cook looked at Plaintiff while laughing is scant evidence that he was indeed laughing at her or that he harbored disability bias. But even if the incident did occur as alleged, it is not so "extreme to amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788, and therefore Defendant's cross-motion for summary judgment on Plaintiff's hostile work environment claim will be granted as well. *See e.g.*, *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78–81 (D.D.C. 2007) (denying a plaintiff's hostile work environment claim because a few isolated incidents and disparate acts do not make a work environment hostile).

## IV.    CONCLUSION

For the reasons set forth above, the court will GRANT Defendant's Cross-Motion for Summary Judgment: ECF No. 50. Plaintiff has not shown that she is entitled to summary judgment, and the court will therefore DENY her Motion for Summary Judgment: ECF No. 49.

Date: April 14, 2023

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge